**ALEXANDER FITZHERBERT, INC.,**
**Libelant,**

v.

Joseph **FRONTIERO** and **THE** Fishing Vessel **DAWN**, Respondents.

**No. 57–44–C.**

United States District Court
D. Massachusetts.

Nov. 17, 1960.

784

Seymour P. Edgerton, Boston, Mass., for plaintiff.

Solomon Sandler, Gloucester, Mass., for defendant.

CAFFREY, District Judge.

This is a libel brought by Alexander Fitzherbert, Inc., owner of the sailing yacht Fearless, *in rem* against the fishing vessel Dawn and *in personam* against her owner, Joseph Frontiero. Libelant seeks damages by reason of a collision which occurred between the two vessels in the late afternoon of Octobor 10, 1957, off the entrance to the Blynman Canal in the western harbor of Gloucester, Massachusetts. Counsel for the parties have stipulated that if the Dawn was solely at fault the Fearless is to recover $5,000; that if both vessels were negligent, the Fearless is to recover $2,500; and that if the Fearless alone was negligent, a finding is to be made for the respondents.

I find that at the time and place of the collision the weather was clear, visibility was good, and there was little or no wind. The yacht Fearless, with Alexander Fitzherbert at the helm and with an experienced yacht captain, Fred W. Russell, Jr., and another passenger aboard, was proceeding from its home port of Marblehead, Massachusetts, to an ultimate destination at Boothbay Harbor, Maine. Immediately before the collision, the Fearless was about to enter Blynman Canal from that part of Gloucester, Massachusetts known as Western Harbor, proceeding in a northwesterly direction. At the same time, the fishing vessel Dawn had left Ipswich Bay and was proceeding via Annisquam River and Blynman Canal toward Western Harbor. (The narrow channel rule, 33 U.S.C.A. § 210, applies to the locus of this accident.)

At material times the current was running easterly through Blynman Canal at a speed estimated by all witnesses to be from three to four knots, it being approximately half-tide. Prior to entering the canal the Fearless sounded the appropriate signal to the drawbridge which is located about 125 feet northwest of the point where the canal empties into Western Harbor. The Fearless entered the canal on her starboard side of the channel. The drawbridge by this time had been opened by the draw tender, Edward J. Levie. I find that upon entering the canal, Mr. Fitzherbert detected the Dawn then at a point about 100 feet on

the northern or further side of the drawbridge. The engines of the Fearless were put astern, it lost its forward headway, and proceeded to back out of the canal, keeping substantially on its starboard side of the channel. This procedure was followed until the stern of the Fearless was out into Western Harbor backing in a southeasterly direction. The maneuver brought the bow of the Fearless to or slightly across the midline of the channel. I find that upon discovering the presence of the Fearless at the month of the channel, Captain Frontiero, who was in the pilot-house of the Dawn, put his engines astern and brought the Dawn to a full stop on his starboard side of the channel at a point a few feet south of the bridge. I further find that the fishing vessel Dawn was then allowed by Captain Frontiero to drift with the ebbing tide in a southeasterly direction, keeping within three or four feet of its starboard wall of the canal. When the Dawn reached a point near the southwest corner of the canal, Captain Frontiero, believing that he could not pass into the harbor by staying on his starboard side of Blynman Canal, (i. e., keeping his port side to the port side of the Fearless), elected to cross to his port side of the channel and attempt to pass between the southwest corner of the canal and the starboard side of the Fearless. According to Captain Frontiero's own testimony, "I shot right across between his stern and the brick wall. The Fearless backed up and closed the gap and I couldn't get through."

The testimony was conflicting as to whether or not the Fearless stayed substantially on her starboard side of the channel at all material times and whether or not the turning motion of the Fearless as she backed around the corner stern-first caused the bow of the Fearless to be placed across the channel in such a way as to necessitate the maneuver attempted by the Captain of the Dawn. I find from testimony of those aboard the Fearless and the testimony of bystanders who observed the accident either from the drawbridge or from a railing along the edge of the canal, that the Fearless stayed substantially on her starboard side of the channel and that she did not extend her bowsprit across the mid-channel line at any material time more than six or seven feet. The channel, according to testimony, is 75 weet wide. It was stipulated that the Dawn had a beam of 15½ feet, and the Fearless 12½ feet. I find it significant that the drawbridge tender corroborated the testimony of Mr. Fitzherbert and Captain Russell to the effect that the Fearless stayed on her own side of the channel. I find it still more significant that one Roland Bagley, an experienced yacht captain, with 9½ years service as a Chief Boatswain's Mate in the Coast Guard, who was offered as an expert on seamanship of small vessels by the respondent, and who witnessed the collision from a vantage point on the southeast corner of the canal, also corroborated the foregoing by expressing the opinion that the Dawn did have room to pass the Fearless on her (the Dawn's) starboard side of the channel. It is not without significance that Anthony Frontiero, son of the Captain of the Dawn, who was stationed as a lookout on the bow of the Dawn at all material times, testified that he attempted to direct the skipper of the Dawn to put the Dawn's engines astern and back the Dawn immediately before the collision while the Dawn was attempting to "shoot" to the starboard of the Fearless between the Fearless and the southwesterly corner of the canal.

Libelant also produced two rebuttal witnesses, both of whom observed the collision from vantage points on shore. These two witnesses corroborated the earlier testimony that the Fearless did not cross the midline of the channel and backed up close to the wall on her starboard side.

Respondent seeks to excuse the course of action taken by a claim that at ebb tide it would have been dangerous for the Dawn to proceed straight into the harbor on her starboard side of the channel. There are several answers to this contention. The U.S. Coast and Geodetic

Survey chart of Gloucester Harbor offered in evidence indicates a depth at mean low water of four feet over a rocky bottom on the Dawn's starboard side as against a depth of one foot over a rocky bottom at mean low water on the port side where the collision occurred. Secondly, another fishing vessel, the Santa Lucia, which was following the Dawn, did in fact proceed directly into the harbor without difficulty by adhering to the starboard side of the channel.

I find that the sole cause of the instant collision was the negligence of the skipper of the fishing vessel Dawn in attempting to "shoot the gap" between the southwesterly corner of the canal and the starboard side of the yacht Fearless, under circumstances which did not give rise to the application of the special circumstances rule contained in 33 U.S.C.A. § 212 and which resulted in a violation of the usual additional precaution rule set out in 33 U.S.C.A. § 221.

Judgment will be entered for the libelant in the amount of $5,000.